UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA S. ELLIS,

        Plaintiff,                        Civil Action No. 06-12759

v.                                          Judge Avern Cohn

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

**MEMORANDUM AND ORDER
ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION,
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I. Introduction**

This is a Social Security case. Plaintiff Linda S. Ellis (Ellis) appeals from the final decision of the Commissioner of Social Security (Commissioner) denying her application for Social Security disability benefits. Ellis's application states that she became disabled on October 10, 2002 due to depression. An administrative law judge (ALJ) conducted a hearing and found that Ellis was not "disabled" within the meaning of the Social Security Act and applicable regulations, and that she was therefore not entitled to benefits. The Appeals Council denied review of the ALJ's decision.

Ellis instituted this action for judicial review under 42 U.S.C. § 405(g). The matter was referred to a magistrate judge, before whom Ellis and the Commissioner filed motions for summary judgment. The magistrate judge issued a report and

1

recommendation (MJRR) that the ALJ's decision be affirmed.  Ellis filed objections to the MJRR.

For the reasons that follow, the Court adopts the MJRR, Ellis's motion for summary judgment is DENIED, and the Commissioner's motion for summary judgment is GRANTED.  The case is DISMISSED.

## II. Background

### A. Facts

The MJRR accurately sets forth the facts, most of which are repeated here.

Ellis was born on April 19, 1957; she was 48 years old when the ALJ issued his decision.  Ellis completed three years of college and worked previously as a staffing consultant/recruiter, account executive, telemarketing supervisor, receptionist, executive secretary, and transcriptionist.

### 1. Ellis's Testimony

Ellis lives with her parents in Flint, Michigan.  She is able to do light housework and take care of her personal needs, such as bathing, dressing, and preparing meals.

Ellis had previously been employed and living in California.  She ceased working in 2002 due to problems stemming from cocaine abuse.  She had also previously abused alcohol and other drugs.  However, Ellis says that she no longer uses alcohol or drugs, and at the time of the hearing, in June 2005, had been clean for 19 months.  Ellis says that she attended Narcotics Anonymous (NA) meetings almost every day and also saw a psychologist or social worker at Catholic Charities of Shiawassee and Genessee Counties approximately once per month.  She says that her treatment has been

2

compromised by her lack of health insurance, and that in particular she has been unable to see a psychiatrist.

Ellis began to suffer from depression after the death of her grandmother, with whom she was close, in 2002 or 2003.[1] She moved home to Flint, Michigan in 2003 to live with her parents and receive treatment.

Ellis currently takes Paxil for depression and says that she suffers side effects of irritability, mood swings (including crying spells), and aggressiveness. Outside of family and a few people that she met through therapy, she has few social contacts, rarely if ever socializes outside the house, and no longer has any hobbies. She says that she avoids social contacts because she is "afraid of [her] own aggression," adding that she recently got into a screaming match with a tenant at one of her parents' investment properties. Ellis says that she had considered looking for work, but is inhibited by the belief that she is incapable of employment and her aversion to being around other people.

In addition, Ellis says that she often has difficulty sleeping through the night and is frequently drowsy due to the Paxil and another medication that she was taking to treat hypertension. As a result, she takes daily naps of two hours or more.

---

[1] Ellis has made inconsistent statements as to the date of her grandmother's death. In the Daily Activities Questionnaire submitted as part of her initial application for disability benefits and dated July 9, 2003, Ellis stated that her grandmother died in August 2002. She gave the same date to treating psychologist Dr. Michelle Pietrugga as part of a Mental Disorder Questionnaire on the following day, July 10, 2003. At the administrative hearing, however, Ellis testified that the death occurred in 2003. This inconsistency may be an example of Ellis's claimed memory problems. In any event, it seems likely that the death actually occurred in 2002.

## 2. Medical Evidence

### a. Treating Sources

In July, 2003, Dr. Michelle Pietrugga, Ph.D., a psychologist, completed a "Mental Disorder Questionnaire Form" in regard to Ellis. The questionnaire stated that Ellis exhibited symptoms of "severe depression," including sadness, loss of appetite, insomnia, low self-esteem, and guilt, and that her grandmother's death exacerbated these symptoms. Pietrugga also noted the difficult experiences in Ellis's past: she had been sexually abused by her step-father at age seven and abused by her former husband over a period of several years. In addition, Ellis struggled with addiction: she had been to inpatient rehabilitation facilities on five occasions in the past, and had been sober for four years before relapsing in 2001. Pietrugga judged that Ellis was "capable of interacting appropriately" with family and friends and had no impairment in terms of her daily activities. despite this her concentration and "ability to adapt to stress common to [the] work environment...[are] impaired at this time due to her depression."

Later, in December, 2003, Ellis sought treatment for depression with Catholic Charities. Though she presented as "attractive" and "pleasant," Ellis also evinced "significant depressive symptoms." In January, 2004, Kimberly Hayek, M.A., of Catholic Charities assigned plaintiff a Global Assessment of Functioning (GAF) score of 51, indicating moderate symptoms or moderate difficulty in social or occupational functioning. Also in January, Dr. Anjana Bhrany, M.D., prescribed Paxil.

In March, 2004, a psychiatric evaluation by Hurley Mental Health Associates stated that Ellis alleged that she had been suffering from depression, characterized by low self-esteem, mood swings, and lack of motivation. However, Ellis said that she

4

enjoyed good relations with her family and continued to attend NA meetings and perform household chores. The examining psychiatrist gave Ellis a "guarded" prognosis and assigned a GAF score of 50, indicating serious symptoms or serious impairment in social and occupational settings. The psychiatrist also opined that Ellis was not capable of managing her own funds.

Throughout 2004, Ellis continued to seek treatment through Catholic Charities. In April, Kimberly Hayek reported that Ellis was "not able to work, but can make future goals for work." In June, Ellis reported that she had begun a romantic relationship, but did "not trust herself to make the right decision." In September, a therapist at Catholic Charities, Laurie Powell, met with Ellis and described her as "pleasant, articulate, cooperative," and "very bright." Throughout her treatment, mental health professionals took note of Ellis's neat dress and attractiveness. In December, Ellis told Powell that she rated her current condition as "4 ½" out of 10, and also stated that the relationship she had begun months earlier had continued to flourish and that she was in love. Powell noted that Ellis was "whole-heartedly working on her recovery."

### b. Consultive Sources

In July 2003, a state agency physician, Mark Salib, M.D., reviewed the record and found that while Ellis experienced both affective and substance addiction disorders, she did not have an impairment that met or equaled a Listing in the Social Security Regulations. Dr. Salib's assessment found that Ellis was mildly impaired as to daily living, social functioning, and maintaining concentration. She retained "the ability to complete everyday household routines and follow simple written/oral instructions." Although Ellis was "moderately limited" in her ability to understand and follow detailed

instructions and interact with the general public, she was capable of "sustained concentration for 8 hours a day on a regular basis" and of "appropriate interaction and relationships with others."

### 3. Expert Testimony

#### a. Medical Expert Testimony

Dr. Louise Centers, Ph.D., a psychologist, was retained by the Social Security Administration and testified at the administrative hearing. Centers opined that Ellis suffered from "major depression current." However, even taking into account the aggravating circumstance of her grandmother's death, Ellis's condition did not meet any impairment in the Social Security Regulation listing. Dr. Centers also stated that the opinions of Dr. Salib constituted "an accurate evaluation" of Ellis's condition.

Relying on the medical records in Ellis's file, Centers judged that while her condition may have prevented Ellis from working at the jobs she held previously, "she very likely could have done some work if she had [a] doctor's help." Even if Ellis was receiving less than optimal therapy, she would nevertheless retain the ability to cope with work demands. Her daily activity log indicated that she was capable of maintaining a normal schedule, although Centers allowed that Ellis's condition could affect her work attendance. Finally, Centers predicted that, with treatment, Ellis's condition would improve within six months to one year.

### b. Vocational Expert Testimony

The agency also retained a vocational expert, Mary Williams, to testify as to Ellis's potential employment opportunities. At the hearing, the ALJ posed the following hypothetical:

> [L]et's assume that we have an individual of Ms. Ellis' age, vocational educational background, let's assume she's unimpaired physically, but has the following condition limitations, to wit: She should be precluded from activities requiring significant contact or interaction with the public, activities requiring significant interaction with...co-workers, in other words, team kind of activities, and activities that...require a continuous high level of focus or concentration, would past work or any other work which exists in the national economy such a person could perform?

In response, Williams testified that, given the above limitations, such an individual could work as a housekeeper (there are an estimated 15,100 such jobs in the lower peninsula of Michigan), kitchen worker (14,900), or inspector (12,900). These jobs could tolerate no more than one absence per month.

In response to a question posed by Ellis's attorney, Williams said that if medication caused an individual to become drowsy to the point "where a person couldn't drive to work, get to work...[and] couldn't concentrate on any position," employment would be precluded.

### B. The ALJ's Decision

The ALJ found that Ellis did not experience an impairment or combination of impairments sufficient to meet or equal anything in the Listing of Impairments in the Social Security Regulations. He said that Ellis suffered from the "severe impairment of depression" and was precluded from performing any of her past relevant work. However, she retained the "Residual Functional Capacity" (RFC) to perform "a full range

of work[] at all exertional levels," so long as she had "no significant contact or interaction" interaction with the public or coworkers and was not required to sustain a "continuous high level of focus or concentration." In accordance with the vocational expert's testimony, the ALJ found that Ellis could work as a housekeeper, kitchen worker, or inspector. In response to Ellis's claims, the ALJ concluded that "her testimony as to the intensity, persistence, and limiting effects of her impairments is not credible" and that "there is not anything in the record that would support an alleged need to lie down and nap several hours a day."

### III. Standard of Review

Judicial review of a Social Security disability benefits application is limited to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997). A reviewing court may not resolve conflicts in the evidence or decide questions of credibility. Brainard v. Secretary of Health & Human Servs., 889 F.2d 679, 681 (6th Cir. 1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). As such, substantial evidence is more than a scintilla but less than a preponderance. Consol. Edison Co. v. NLRB, 305 U.S. 197, 299 (1938). The substantiality of the evidence must be based upon the record taken as a whole. Futernick v. Richardson, 484 F.2d 647, 649 (6th Cir. 1973). The portions of the MJRR that the claimant finds objectionable are reviewed de novo. See 28 U.S.C. § 636(b)(1)(C); Smith v. Detroit Fed'n of Teachers, Local 231, 829 F.2d 1370, 1373 (6th Cir.1987).

8

## IV. Discussion

Ellis argues that the ALJ's decision is not supported by substantial evidence because (1) the ALJ failed to note with specificity which portions of Ellis's testimony were lacking in credibility,(2) the ALJ failed to take account of the medical expert's testimony recommending additional therapy, (3) the record provides a sufficient basis for an award of a closed period of benefits, and (4) the ALJ's determination as to Ellis's RFC failed to account for the side effect of drowsiness caused by Ellis's medication.

### A. The ALJ's Credibility Determination

Ellis first argues that the ALJ's determination that portions of Ellis's testimony were not credible was not supported by substantial evidence because the ALJ failed to articulate his reasons or identify with specificity those portions which were not credible. The Court rejects this argument and adopts the MJRR's conclusion that the ALJ's credibility determinations were detailed and specific enough to survive the deferential "substantial evidence" review.

Credibility determinations are made by the ALJ, not the reviewing court. Brainard, 889 F.2d at 681. The ALJ's credibility determination is governed by Social Security Regulation 96-7p. That regulation provides that "whenever the individual [claimant]'s statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." Where applicable, the ALJ must also consider factors such as the "type, dosage, effectiveness, and side effects" of medication in making a credibility determination. C.F.R. 404.1529(c)(3).

9

Here, the ALJ's decision concluded that "[a]lthough [Ellis] reports some drowsiness from medication, there is not anything in the record that would support an alleged need to lie down and nap several hours a day."  The ALJ also specifically pointed to the expert medical testimony of Dr. Centers, who "believes to a reasonable degree of medical certainty that [Ellis] can sustain a normal work routine and sustain work" in spite of the claimed drowsiness.  Moreover, as noted in the MJRR, records related to Ellis's treatment in 2003 and 2004 fail to mention that Ellis's work abilities were impaired by drowsiness, although the records do take account of many other symptoms such as mood swings, loss of self-esteem, and dysphoria.  Accordingly, the Court finds that the ALJ's determinations as to Ellis's credibility were supported by substantial evidence.

### B. Expert Medical Testimony Recommending Additional Therapy

Next, Ellis argues that the ALJ's determination that Ellis did not suffer from a cognizable disability under the Social Security Regulations is not supported by substantial evidence because the ALJ failed to take account of expert medical testimony recommending that Ellis continue therapy for six months to a year.  This argument misconstrues the testimony of the medical expert, Dr. Centers.  At the administrative hearing, Dr. Centers testified that while Ellis would improve with additional therapy, she was ready to work immediately.  Dr. Centers further stated that Ellis would be able to cope with the demands of work even if she were receiving less than optimal treatment.  No medical professional who treated Ellis ever opined that she was incapable of any employment.  In light of all this, the Court finds that the ALJ's determination that Ellis did not suffer from a listed disability is supported by substantial evidence.

## C. Closed Period of Benefits

Ellis also makes the related argument that "[t]he record as a whole sufficiently provides a basis for a closed period of benefits," presumably to allow Ellis to receive additional therapy before returning to work.  This argument ignores the deferential standard of review applicable here and invites the Court impermissibly to reweigh the evidence.  See Richardson, 402 U.S. at 399-400.  The district court is limited to determining whether the ALJ has applied the correct legal standards and made findings of fact that are supported by substantial evidence.  42 U.S.C. § 405(g); Walters, 127 F.3d at 528.   If substantial evidence supports the ALJ's decision, the Court must affirm his decision, even if it might have decided the case differently in the first instance. Smith v. Chater, 99 F.3d 780, 781 (6th Cir. 1996).  As discussed above, there is substantial evidence to support the ALJ's finding that Ellis did not suffer from a recognized impairment, and his decision is well within the "zone of choice" afforded to the fact-finder at the administrative level.  Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986).  The Court again notes that no medical professional who treated Ellis ever opined that she was incapable of any employment and that contemporaneous treatment records fail to mention the debilitating drowsiness that Ellis now alleges.   Ellis's argument is therefore rejected.

## D. The ALJ's Finding of Residual Functional Capacity

Finally, Ellis argues that the ALJ's determination that Ellis had the residual functional capacity to perform some work is not supported by substantial evidence. Specifically, Ellis points to the ALJ's alleged failure to credit medical testimony recommending additional therapy as well as testimony regarding the side effects of

11

Ellis's medication, particularly drowsiness. These allegations have already been discussed above; the ALJ's determinations that Ellis did not require additional therapy before returning to work and did not require long daily naps as a result of her medication were reasonable and well supported by record evidence.

Relatedly, in her objections to the MJRR, Ellis claims that the magistrate judge misstated the law regarding the hypothetical questions to the vocational expert posed by the ALJ at the administrative hearing. Ellis fails to specify precisely how the law was misstated, however, and merely cites a single case for the proposition that the ALJ's hypothetical questions must include a "complete assessment of the claimant's physical and mental impairments and should include an accurate portrayal of her physical and mental impairments." Howard v. Commissioner, 276 F.3d 235, 239 (6th Cir. 2002).

Ellis's argument is undercut by a later decision in which the Sixth Circuit limited what may seem to be far-reaching language in Howard:

> We read *Howard* to hold only that a denial of benefits based upon an ALJ's improper calculation of a claimant's residual functional capacity, a description of what the claimant "can and cannot do," must be reversed. Admittedly, there is some confusing language in *Howard* that could conceivably be viewed as requiring that hypothetical questions include lists of claimants' medical conditions. However, we conclude that, given the facts present in *Howard,* that language is not part of its holding, nor can it be so construed if *Howard* is to be read to be consistent with the holdings of our prior decisions.

Webb v. Comm'r of Soc. Sec., 368 F.3d 629, 631-32 (6th Cir. 2004). Webb makes clear that Ellis's invocation of Howard is unavailing. In any event, the ALJ's hypothetical questions did include a number of Ellis's allegations, including an inability to interact significantly with coworkers or the public or sustain a high level of focus or

concentration. Although the ALJ declined to mention Ellis's alleged need to take daily naps, it is well established that "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." Stanley v. Sec'y of HHS, 39 F.3d 115, 118 (6th Cir. 2004).

### V. Conclusion

The findings and conclusions of the magistrate judge are adopted by the Court as supplemented by the above discussion. The ALJ's decision accurately states the applicable legal standards and is supported by substantial evidence. Ellis's motion for summary judgment is DENIED; the Commissioner's motion for summary judgment is GRANTED. The case is DISMISSED.

SO ORDERED.


Dated: September 17, 2007          s/Avern Cohn
                                   AVERN COHN
                                   UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, September 17, 2007, by electronic and/or ordinary mail.


                                    s/Julie Owens
                                    Case Manager, (313) 234-5160